8924

'TWIGGS *ET AL.* v. WILLIAMS *ET AL.*

(82 S. E. 676.)

APPEAL AND ERROR. CASE. CONTRACTS. EVIDENCE. CONSTRUCTION.

1. The rule governing preparation of the case on appeal, restated, and
   the bar warned that cases not prepared in accordance with the rule,
   are not entitled to consideration.
2. Where reference is made in a written contract to a prior conversa-
   tion for the purpose of confirming so much as is included in the
   written contract, the portions of the conversation not so included are
   not a part of the contract, and testimony as to them is inadmissible.
3. A subcontractor agreeing to sign the same kind of a contract with
   the principal contractor, as the latter has with a railroad company,
   adopts the provisions of the latter contract as to the supervision of
   the work by the railroad engineer, methods of computation and
   methods of settlement, and is estopped to say that he did not know
   or understand such terms.
4. A contract providing that grading shall include all excavations and
   embankments, to be paid for one way only, according to the largest
   quantity, and there being no terms limiting excavations to those
   within the limits of the roadbed, the subcontractor is entitled to
   compensation for all excavations necessarily made in the perform-
   ance of the contract, whether within or without the limits of the
   roadbed.

Action by A. J. Twiggs and J. D. Twiggs, partners under the firm name of A. J. Twiggs & Son, against W. Z. Williams, W. A. Young and A. P. Cornell, partners, doing business under the firm name of W. Z. Williams & Co., and J. S. Bowers.   From a decree modifying the judgment recommended by the master, the defendants appeal.

The master's report was as follows:

To the Honorable, the Court of Common Pleas:

Briefly stated, this cause was referred to me for an accounting between the parties, and to report to the Court my conclusions of law and fact.

The testimony taken is herewith submitted, in pages numbered 1 to 544, inclusive, together with the exhibits therein referred to.   The stipulations entered into as the hearing progressed, pages 303 to 304, have eliminated from the contest a number of the items shown in their respective accounts, and made irrelevant a large part of the testimony taken.

The contested items must be allowed or disallowed upon consideration of the testimony relevant thereto, as governed by the contract between the parties on which the work was awarded and undertaken.

It must be first determined what that contract was.

The defendants, Williams & Co., as railway contractors, were awarded a contract by the Atlantic Coast Line Railway Company to do certain work in double-track and yard construction in the vicinity of Charleston.   The yard construction was then undertaken by the plaintiff, as subcontractors, the scope and detail thereof having been discussed by members of the respective firms, on the ground, prior to the awarding of the contract.

May 17, 1910, Williams & Co. wrote Twiggs & Son (Plaintiffs' Exhibit "A"), as follows:

"Confirming previous conversation and the conversation today with your Mr. A. J. Twiggs, also wire from Wil-

mington, beg to advise that we will give you contract for all the grading, tracklaying and switches at Bennett Yards, near Ashley Junction, at the following prices: For grading, 22 cents per cu. yd., one way.

Tracklaying and surfacing without ballast, $450 per mile.

Tracklaying and surfacing with ballast, R. R. Co. to furnish ballast and dump it in center of track, you to do the spreading, $495 per mile.

Putting in switches, $22.50 per set.

It is distinctly understood that this contract is awarded you with the understanding that you are to do it on contract time, and that you will sign same kind of contract with us as we have with the Atlantic Coast Line."

May 20, 1910, Twiggs & Son wrote Williams & Co. (Plaintiffs' Exhibit "B"), as follows:

"Yours of the 17th, covering agreements made on the Bennett Yard, near Charleston, S. C., received. Terms are satisfactory. We are waiting on the two flat cars to be placed at Savannah River to load material and shovel parts and transportation to Charleston," etc.

There is a conflict of testimony as to what was said between the parties at the time of the conversations prior to Williams' letter of May 17, 1910, and I have been unable to reach a conclusion that there was such a mutual understanding between the parties as a result of these conversations as to amount to a contract, except the agreement as to prices to be paid, which is not disputed.

I find that Twiggs & Son were experienced railroad contractors, and knew, or should have known, in at least a general way, the usual terms of a contract of this nature— supervision by the railroad engineer, method of computation and manner of settlement. Having agreed to sign with Williams & Co. "the same kind of contract" as Williams & Co. had with the Atlantic Coast Line, they began the work with that distinct understanding and were bound by all of its terms, except as to prices and scope of work to be done

28—98.

by them, and cannot now invoke the previous conversation relating to the work save to the extent that the same may explain any ambiguity growing out of the changes in the wording of the contract made necessary by the limit of the work awarded to them.

This, I think, was the legal status when plaintiffs started the work without first requiring the production of Williams of his Coast Line contract for comparison. Had this been done, the principle laid down in the case of *Pratt v. Hudson River R. R. Co.*, 21 N. Y. 309, might have been invoked in defending an action for nonperformance. As I conceive the situation here, this decision does not apply. Performance is obligatory where the contract is well understood. One who undertakes to perform under an uncertain or ambiguous contract is bound by a reasonable construction of the contract and cannot, after performance, or in the course of performance, insist on his understanding as opposed to the understanding of the other party to the contract. And particularly is this true where, as in the case at bar, certain clauses of the contract submitted for signature were relied on and invoked, and other clauses acquiesced in, such as involved computations, estimates, extra work, etc.

This brings us to a consideration of the contract between Williams and the railroad (Defendants' Exhibit "6"), and the contract sumbitted by Williams to Twiggs for signature (Plaintiffs' Exhibit "C"). Wherein do they differ?

I find that the only material difference for consideration here is found under the head of "Grading." Williams was to do double-tracking as well as yard construction work under his contract, and was to be paid for both excavation and embankment "by roadbed measurement" at 18½ per cubic yard. It was clearly understood that Twiggs, under his subcontract for the Bennett Yards work, was to do both excavation and embankment, and was to be paid "one way only" at the rate of 22c. per cubic yard. I find that the term "one way only" was properly set out under

the head of "Grading" in the copy contract submitted by
Williams to Twiggs (Plaintiffs'. Exhibit "C") as "either
for excavation or embankment, according to the largest
quantity." It was not stipulated by Williams that the
grading measurement was to be "roadbed measurement," and
I find, in the absence of such limitation, that plaintiffs were
entitled to compensation at the agreed rate per cubic yard
for either excavation or embankment, which ever was the
largest quantity, the term "one way only" limiting the pay-
ment so that same could not be figured on both excavation
and embankment; and that the limitation was not to the
excavation and embankment done within the roadbeds lim-
its as it was under the contract between Williams and the
Atlantic Coast Line.

Another question at issue is whether or not, in accordance
with the conversations and under the terms of the contract
submitted, Twiggs, as subcontractor, was to furnish sur-
facing material at his own expense and lay the same under
the agreed item for "tracklaying and surfacing without
ballast" at $450 per mile. Williams' letter of May 17,
1910, does not say in so many words that the contractor
was to furnish surfacing material. Mr. Twiggs says that
Mr. Williams did not so inform him in the course of con-
versation. Both contracts, however, provided that surfac-
ing material was to be furnished, delivered and put in place
by the contractor at his own expense. And I find further,
from the testimony, that tracklaying and surfacing "can-
not be made complete without the necessary material."
Track "laid and surfaced" must be at true line and level
and thoroughly tamped, and this I find to mean placing and
packing of the dirt under, at the ends, and between the cross-
ties.

During the progress of the work the plaintiffs secured
advances in money from the defendants, Williams & Co.,
for which they gave their several promissory notes, as set
out in the complaint, and to secure the same executed and

delivered to the said defendants a chattel mortgage on one Bucyrus steam shovel. Williams & Co. refused to make further advances, and, on the —— day of December, 1911, plaintiffs notified Williams & Co. that they were unable to complete the work for lack of funds, and same was taken over by Williams & Co. for the account of the plaintiffs and carried to a conclusion under their superintendence and management, by the use of the plant and forces which plaintiffs had theretofore employed in pursuance of the contract.

On the 13th day of February, 1911, Williams & Co., having completed the work called for under the contract, submitted to Twiggs & Son a statement of the account. It is contended that Mr. A. J. Twiggs' letter of February 15, 1911, acknowledging this statement as correct except in a few minor particulars, is a bar to the plaintiffs requiring any further accounting for the period covered, and an acknowledgment of the correctness of the account submitted. I cannot so find. The account is based on monthly estimates, and it seems to have been clearly recognized by both sides that it was subject to examination and correction before the final settlement. The submission by the plaintiffs of their statement of the account at the time fixed by Williams & Co. for a final conference and settlement shows that they reserved and insisted upon the right to a strict accounting.

The plaintiffs claim several large items as due them for extra work made necessary by changes in grade and other changes in plans alleged. Both contracts are very clear on the method by which and the time at which claims for extra work, known as "force account," should be made. This method was recognized by both parties as to numerous items, and I find that under the contract plaintiffs cannot recover for such items held over for some time after having left the work, and after final estimate—based upon engineer's monthly estimates and extra compensation allowed— had been submitted

It is a fair inference from the testimony that the plaintiffs, partly because of lack of more suitable equipment, and partly, perhaps, because of lack of sympathy and co-operation on the part of the engineer force, did do certain work that entailed upon them the extra and ordinarily unnecessary expense.    I am not satisfied that this work would have been compensated for if claim had been made in the form of force account at the proper time.    However that may be, it is beyond question that plaintiffs failed to take the proper steps from time to time to protect the rights they now claim under the contract.

In stating the account, between the parties, I am met at the outset with a matter of great difficulty.    I have concluded that under the contract between Twiggs and Williams the engineer of the Atlantic Coast Line was to figure the amount of work done and that his figures were to be accepted as final.    This, however, on the assumption that the engineer was to make his calculations and estimates on the contract between Twiggs and Williams in addition to and entirely independent of his calculations and estimates on the contract between Williams and the Coast Line.    But Mr. Nichols, who was the representative of the Atlantic Coast Line on the work, and was also, so far as the plaintiffs are concerned, the representative of Williams & Co., testifies very positively that at no time did he consider the work on the Bennett Yards as any other than a "two-way" contract, and that all of his measurements and estimates were made on that basis.    It might be of assistance in determining the quantities if the Court were in possession of the original estimates of the Bennett Yards work as made by Mr. Nichols for the monthly settlements between the Coast Line and Williams & Co.    These not being available, we must endeavor to reconcile the difference in the final figures as made by Mr. Nichols and Mr. John D. Twiggs.    Twiggs claims from his measurements that he should be allowed for 106,019 cubic yards of excavation, at

22c. per cubic yard, exclusive of allowance for the muck-hole. Nichols figures the proper allowance for excavation, including (as does Twiggs) the borrow pit, and exclusive of the muck-hole, 86,039 yards. In these figures Twiggs allows for the borrow pit 36,463 yards, while Nichols allows 29,868. As both calculations are based on an assumption as to the surface elevation before cutting, I think it fair to divide the difference of 6,595 yards, and deduct from Twiggs' claim of 106,095 yards, for that reason, 3,298 yards, leaving his figures at 102,721 yards. There should be a further deduction from Twiggs' figures for surfacing material, which I find plaintiffs were, under the contract, to furnish and put in place. Taking from the testimony an average of 700 yards per mile for necessary surfacing material, for 14.85 miles, this would amount to 10,395 yards, which would leave 92,326 yards, subject to a further deduction for material wasted, say 4,000 yards, leaving 88,326 yards of excavation to be compensated for at 22c. per cubic yard.

No question is made as to the number of miles of track laid, nor the number of switches or the allowance therefor.

As to the muck-hole item, I think the plaintiffs should be allowed the 1,464 yards at 22c., amounting to $324.08, and the $150 for extra compensation. There is some conflict of testimony as to whether this was agreed upon. Williams allowed it and then charged it back by a cross entry, claiming that the Coast Line wouldn't allow it and that the credit was made in error. Mr. Nichols' testimony, however, shows that Williams & Co. were paid for this work by a "two-way" allowance of 1,624 yards at their contract price. It is proper that Twiggs should have compensation for it on some extra basis. Under the testimony, that was the usual method adopted when work of this character was encountered, and both Twiggs and Williams did agree on the amount claimed as fair.

I find that Twiggs & Son are entitled to the items charged on their corrected statement of March 10, 1911, under the head of force account items, except the rail-bender charge and the charge for unloading material, which was withdrawn. I find that they are also entitled to recover $42.30 freight paid on engine which was to have been dead-headed back to them at Augusta.

I find that the plaintiffs are not entitled to recover any of the items charged under the head of additional expense for laying track, handling dirt and filling, nor for labor raising tracks caused by change in grade.

I find the amounts properly chargeable by the plaintiffs and for which they are entitled to recover from Williams & Co., as follows:

Total excavations, less proper deduction, 88,326
    cu. yds. @ 22c. per cu. yd..................$19,431 72
Amount to be added by agreement recorded on
    page 304 of testimony..................     38 70

                               $19,470 42
Less dirt sold, p. 531 of testimony..........     36 08

                               $19,434 34
Track laying—14.85 miles at $450.:..........   6,682 50
74 switches @ $22.50 each................   1,665 00
Force account, September ..................      67 92
              November ...................      49 02
              December ..................      48 29
           .......................      52 00
              January ...................      12 00
           ......................      16 77
              February ..................      50 60
           ......................      22 55
           ......................      65 81
Allowance for muck-hole—1,464 yds. at 22c....     324 08

| Exceptions. | [98 S. C. | |
|---|---|---|
| Allowance for muck-hole—extra............$ | 150 | 00 |
| January commissary sales................. | 7 | 45 |
| Freight paid on engine, Chas. to Augusta....... | 42 | 30 |
| | $28,690 | 63 |
| Paid Twiggs by William & Co.—Twiggs' testimony, p. 127......................... | 28,140 | 22 |
| Balance due by Williams & Co. to Twiggs & Son ............................$ | 550 | 41 |

I adopt Twiggs' statement of the total credits Williams is entitled to for the reason that it seems to have been practically accepted as correct, and is practically checked by my own calculations from Williams' statement rendered.

I find therefore that the notes given by Twiggs & Son to Williams & Co. and secured by mortgage of one Bucyrus steam shovel, as set out in the pleadings, have been more than paid by the amounts due the plaintiffs, Twiggs & Son, under the contract.

I therefore respectfully recommend:

That the temporary restraining order herein be made permanent, and the plaintiffs' bond discharged.

That plaintiffs have judgment against the defendants, W. Z. Williams & Co.

First. For the sum of five hundred and fifty and 41-100 ($550.41) dollars, and the costs of this action.

Second. For the delivery by the defendants, W. Z. Williams & Co., to the said plaintiffs of the notes and mortgage in evidence herein, duly satisfied, for cancellation.

Respectfully submitted,

December 14, 1912.          F. K. MYERS, Master.

The defendants' exceptions to the Circuit decree were as follows:

1. We submit the Circuit Judge erred in overruling the report of the master, which found as follows:

"I find that Twiggs & Son were experienced railroad contractors, and knew, or should have known, in at least a general way the usual terms of a contract of this nature— supervision by the railroad engineer, methods of computation and manner of settlement. Having agreed to sign with Williams & Co. the same kind of contract as Williams & Co. had with the Atlantic Coast Line, they began the work with that distinct understanding and were bound by all of its terms except as to price and scopes of the work to be done by them, and cannot now invoke the previous conversation relating to the work save to the extent that the same may explain any ambiguity growing out of the changes in the wording of the contract made necessary by the limit of the work awarded them."

In overruling this portion of the report his Honor says:

"It is true that the general rule is undoubtedly that where there is a written contract (such as contained in the letters of May 17th and 20th) parol evidence is excluded, but there are exceptions, and I am of opinion that this case falls within (the exceptions as laid down in) the decision of *Herlong* v. *Southern States Lumber Co.,* 77 S. E. R. 219, 93 S. C. 529, etc."

The error being:

1. That plaintiffs having entered into a written contract to sign "the same kind of a contract" as the contract between the defendants and the Atlantic Coast Line Railroad Company, the plaintiffs are bound by the terms of such contract and cannot now invoke previous conversations to alter, modify or add to their agreement. All previous oral agreements and conversations are merged into the written contract. Plaintiffs were bound by their written contract; that is, they were bound by the terms "of the same kind of a contract" as existed between defendants and the railroad company.

2. The Herlong case is only the well-recognized principle of a partly written, partly oral contract, which requires

parol testimony to show what is the contract. The case at bar is quite different. Here the previous conversations leading up to the correspondence culminated and were crystalized in the contract made by the correspondence. In the case at bar the parties were careful to "confirm" their understanding of all previous conversations by reducing them to a written offer and a written acceptance—a written contract. Parol testimony as to previous conversations is, we submit, inadmissible in such a case.

3. We submit that the only matter open for testimony was embraced in that part of the agreement which states "you will sign the same kind of contract with us as we have with the Atlantic Coast Line." The only admissible testimony was testimony tending to show the kind of contract the Coast Line had with defendants. That contract was undisputed and was in writing. Parol testimony of conversation between plaintiffs and defendants is inadmissible to show the terms of such written contract which was the only "kind of contract" between the parties. The terms and stipulations of the Coast Line contract were binding upon Twiggs & Son, so far as they were applicable to their subcontract, and could not be varied by parol testimony of loose antecedent conversations.

2. It was error to overrule the master's report and hold that Twiggs & Son were not bound by the terms of their written contract because they either omitted, neglected or refused to sign the kind of contract they had agreed in writing to sign and to hold that "such written contract cannot be binding until signed." We submit that:

1. The Courts have decided time and again and many years ago that when parties to a contract have agreed upon the terms, although the contract calls for a mere formal contract to be signed between the parties, the contract itself is completed and the terms to be embodied in the formal instrument become a part of the original contract whether signed or not.

2. We submit the signature of Twiggs & Son to Exhibit "C" was not necessary to bind them to its terms and conditions because their signature to an acceptance of the original contract already bound them to such terms. By comparison it will be seen that Exhibit "C" is an exactly similar contract, and Twiggs & Son are, therefore, bound by its terms by virtue of their agreement to sign a similar contract to the Coast Line contract. In law they are so bound, and it is quite immaterial whether they accepted, refused or neglected to sign Exhibit "C."

3. If parol testimony were admissible to prove the conversations prior to the contract, then we submit the Circuit Judge erred in not accepting the clear and accurate account of such conversations as established by the testimony of Mr. W. Z. Williams and the equally clear and concise statement of Mr. W. A. Young as the correct account of such conversations. Their account of the oral understanding is corroborated and confirmed by the actual contract subsequently made by the correspondence and establishes the contract as claimed by defendants by at least the greater weight of the evidence.

4. We submit the Circuit Judge erred in holding as follows:

"I cannot hold that the terms of the contract submitted for signature had in all respects been definitely understood and agreed upon," for the reasons:

1. The terms of the contract were in writing and the definite understanding and agreement of the parties must be derived from those terms alone. The meaning, the understanding, the construction of a written contract is to be determined by the Court and not by the parol testimony of the parties as to their understanding of it.

2. The simple question was whether the contract submitted for signature was the same kind of a contract as the Coast Line contract. If it was (and it certainly was), then

the parties were bound by its terms, and their understanding is in law expressed by those terms alone.

5. It is submitted the Circuit Judge erred in overruling the master and holding:

"The terms of the contract, as stated in the letters, does not agree with the contract submitted for signature, for the offer of May 17th makes the compensation for tracklaying and surfacing without ballast $450 per mile, while the contract submitted contained the requirement that contractor should furnish at his own expense the surfacing material, etc.," because:

1. A contract for tracklaying and surfacing at $450 per mile is identical with a contract containing the requirement that contractor shall furnish at his own expense the surfacing material. Both require the contractor to furnish the surfacing material. The master says upon this point: "Williams' letter of May 17, 1910, does not say in so many words that the contractor was to furnish surfacing material. * * * Both contracts, however, provided that surfacing material was to be furnished, delivered and put in place by the contractor at his own expense, and I find further from the testimony that tracklaying and surfacing cannot be made complete without the necessary material. Track laid and surfaced must be at true line and level and thoroughly tamped, and this I find to mean placing and packing of the dirt under the end and between the crossties. We submit, therefore, that the master was right and the Circuit Judge wrong, both on law and fact, in allowing Twiggs & Son credit for 10,395 cubic yards of surfacing material at 22 cents per cubic yard. The Circuit Judge has by this holding given to Twiggs & Son $2,837.31 of the money of Williams & Co. He has given them this for furnishing surfacing material which they agreed in writing to furnish and for which they were already paid at the rate of $450 per mile "for tracklaying and surfacing."

6. The Circuit Judge erred in holding that plaintiffs were entitled to compensation for excavation made without the limits of the slope stakes, because:

1. By such conclusion he has made an erroneous construction of the contract of the parties and has disregarded the uncontradicted testimony of expert witnesses and engineers as to the meaning of technical terms in the contract.

2. It was clearly erroneous to hold that the absence of the words "roadbed measurement" indicated that plaintiffs were to be paid for work, or excavation such as the borrow pit, done outside of the limits of the slope stakes as set by the engineers of the railroad company, for the following reasons:

Defendants as railroad contractors had contracted for certain work of the Atlantic Coast Line Railroad Company, which work included a portion of the double track work of that company and the construction of what is known as Bennett Yards. The plaintiffs were also railroad contractors and familiar with this class of work and with the terms of these kind of contracts, and with this knowledge sublet the Bennett Yards portion of the work. In fixing the amount of their compensation in the contract between defendants and the railroad company, the Coast Line contract provides that defendants were to be paid 18 1-2 cents per cubic yard "roadbed measurement." It is established by the testimony, admitted by both sides, that the words "roadbed measurement" mean payment for all quantities, whether an embankment or excavation. It is what is known as "a two-way contract." In fixing the amount of compensation in the subcontract between plaintiffs and defendants the contract provides for a "one-way payment;" that is, plaintiffs were to be paid 22 cents per cubic yard either for excavation or embankment, whichever was the largest quantity, but not for both. In other respects, the contracts were to be the same; it was the same work to be done under the same kind of a contract. As the contract and subcontract

related to and covered the same work and were by agreement to be similar, except as to the method of payment, it is obvious that the words "roadbed measurement" could not be used in the subcontract, because those words require "both ways," as above stated.

3. There is no dispute that within the slope stakes embankment was the largest quantity, and was, therefore, the quantity governing plaintiffs' compensation under the one-way payment agreed upon. The very existence of a borrow pit shows this, because if excavations were the largest quantity, it would be unnecessary to go outside of the slope stakes and "borrow" earth to make the embankment. It is submitted that plaintiffs' contention that excavation is the largest quantity by including the contents of the borrow pit cannot be sustained because the work they bid upon and the contract they made was for excavation or embankment, "whichever was the largest quantity," cut or fill, under the railroad contract which they had undertaken.

4. Plaintiffs' own testimony and admissions show that he accepted the work with this understanding; that he was told at the inception of the work that the engineer's estimate was embankment, 65,000 cubic yards; excavation, 45,000 cubic yards.

5. The testimony shows, and the master found, that Twiggs & Son were experienced railroad contractors and knew, or should have known, the usual terms of a contract of the nature of the contract sued on; that is, supervision by the railroad engineer, methods of computation and manner of settlement. Twiggs & Son being bound by the terms of the same kind of a contract as the contract between Williams & Co. and the Coast Line, it was error to hold that Twiggs & Son were entitled to quantities outside of the slope stakes.

6. Because the testimony shows, and the fact is, that all experienced railroad contractors know that the quantities to be paid for are the roadbed measurement quantities; that

is, quantities within the limits of the slope stakes, and this is true both as to subcontractors and contractors.

7. Because Twiggs & Son were bound by "the same kind of contract" as the Coast Line contract, and as the Coast Line contract restricted the contractors to roadbed measurement, which measurement confines the quantities to the slope stakes, the contract of the subcontractors of the same kind must necessarily be restricted within the slope stakes.

8. The testimony shows that the only proper construction of the contract confines the quantities to the roadbed.

9. Because in the absence of express agreement to the contrary railroad work confines both contractor and subcontractor to quantities within the roadbed or slope stakes, and there is no such express agreement in this case.

10. It is error, we submit, and palpably inconsistent to recognize that plaintiffs are bound by "the same kind of contract" as that of the contractors and then allow the subcontractors for excavation outside of the roadbed, which is a wholly different contract.

11. It was error to base a finding upon the absence of words which could not have been used.

7. The Circuit Judge states that there are "no words of limitation, either in the letter or that part of the submitted contract, providing for payment, limiting it to roadbed measurement or between the limits of the slope stakes." We submit this is incorrect and erroneous, because:

1. The letter of May 17th distinctly states: "For grading, 22 cents per cubic yard one way." The evidence is that these words themselves limit the work to the slope stakes. The grading could not extend beyond the slope stakes—and the words "one way" themselves confine the work to the roadbed.

2. Again the submitted contract (Exhibit "C") does expressly limit the work to the slope stakes, and by reference thereto the Court will see that under the head of excavation and embankment·that the work is so limited. This

error is so plain it is evident the Court must have overlooked these terms of the contract.

3. The Circuit Judge bases his ruling upon the supposed absence of words of limitation in the submitted contract. Yet the Circuit Judge also rests his decision upon the ground that "the terms of the contract, as stated in the letters, does not agree with the contract submitted." This, we submit, renders the decision below wholly inconsistent and illogical. If the submitted contract was not the contract of the parties, then the presence or absence of words therein cannot be a basis for decision. We have shown, however, that the submitted contract does contain words of limitation. On the other hand, if the wording of the submitted contract should control, it can only be because it is the contract of the parties. We submit it is the contract and that it does limit the work to the slope stakes.

8. The Circuit Judge erred in overruling the report of the master in allowing the plaintiffs compensation for surfacing material, because:

1. The price for tracklaying and surfacing necessarily by its very terms, under the testimony, includes the surfacing material to be placed upon the tracks and roadbed, and it was error to construe the contract otherwise.

2. Because both the Coast Line contract and Exhibit "C," which is the "same kind of a contract," provide as follows:

"And it is distinctly understood and agreed that all material for surfacing must be provided, hauled and put in place by the contractor, and that the price for tracklaying and surfacing is to include the providing, delivery and putting in place of all such surfacing material as is required by the specifications."

We, therefore, submit that the correspondence constituting the contract embodied the terms of the Coast Line contract as a part of the contract, and by those terms the plaintiffs were bound to furnish surfacing material.

3. Because in overruling the report of the master and allowing plaintiffs compensation for surfacing material, the Circuit Judge has compensated the plaintiff twice for the same work. Plaintiffs agreed to do the tracklaying and surfacing for $450 per mile, which compensation they have admittedly received. Yet the Court now awards them $2,837.31 for that for which they have already been paid.

. 9. The Circuit Judge erred in holding as follows:

"I can see no reason for reversing the account stated by the master except as to the disallowance of the 10,395 cubic yards of surfacing."

1. Because by the terms of the contract of the parties they were bound by the terms of the Coast Line contract, under which no work outside of the limits of the slope stakes was to be allowed for.

2. One of the terms of the contract, by which Twiggs & Son were bound, expressly provides that the decision of the railroad engineer as to quantities or other matters in dispute shall be final. Mr. Nichols, the engineer, testified that embankment was the largest quantity, and that the quantities were as follows: Excavation, 55,336; embankment, 71,176. He says he made these measurements and they are correct. We submit that plaintiffs are in law bound by his measurements, calculations and statements, and the master so held, although he himself disregarded them.

3. The master finds that the contract provided that the Nichols figures were to be accepted as final, and the Circuit Judge "sees no reason for reversing the account as stated by the master," yet the master and the Circuit Judge in their calculations have repudiated the figures of the impartial engineer and accepted the figures of J. D. Twiggs. The basis of this erroneous calculation commences with the acceptance of the statement of J. D. Twiggs that the total excavation was 106,019 cubic yards.

29—98.

4. No fraud, collusion, or incompetency is charged in the case, and we submit as matter of law that the figures of Nichols are final and conclusive.

5. The Circuit Judge says that the calculations of the engineer as to work within the slope stakes was accepted by Twiggs as correct. Yet the Circuit Judge affirms the erroneous calculations of the master. He erroneously takes the statement of J. D. Twiggs that the total excavation was 106,019 cubic yards. Now, Nichols, the engineer, testified that the excavation within the slope takes was 55,336 cubic yards. Mr. Twiggs testified his measurement of the borrow pit was 36,463 cubic yards. Deducting 36,463, his borrow pit measurement, from his 106,019 should, therefore, give Twiggs' figures as to the excavation within the slope stakes. This, however, would make Twiggs' figures within the slope stakes 69,556 yards, which is not correct, if he accepted, as the Circuit Judge says he did, Nichols' figures of 55,336 as the correct excavation within the slope stakes. It is a difference of 14,220 yards. We submit it is manifest that the figures of the engineer, even for work within the slope stakes, accepted as correct, have been repudiated in this calculation.

6. The master states in his findings that Nichols figures the proper allowance for excavation, including the borrow pit, and exclusive of the muck-hole, 86,039 yards. This seems to be arrived at as follows: Nichols says that the total excavation, including the muck-hole and borrow pit, amounts to 87,663 yards, and that the muck-hole amounted to 1,624 yards, which, deducted from 87,663, would leave 86,039 yards. Nichols' figures are as follows: Excavation in yard above subgrade, 47,221; excavation in yard below subgrade, 3,667; borrow pit above subgrade 26,971; borrow pit below subgrade, 2,897; total excavation in muck-hole, 1,624; total excavation in ditches, 3,682; total excavation for Ashley River change of line, 1,601—87,663.

According to the master, Mr. Nichols testifies that the correct total excavation, excluding the muck-hole and including the borrow pit, is 86,039 yards.  Now, deducting from this the surfacing material of 14.85 miles at 700 yards to the mile, which amounts to 10,395 yards, would leave a balance of 75,644 yards, and from this balance deduct the 4,000 yards wasted would leave the correct yardage for settlement 71,644.  The final estimate showed total embankment 71,176, which corresponds with Nichols' testimony. Nichols arrives at 71,176 yards of embankment as follows: Includes all embankment within the slope stakes on the yard, includes also change of line in Ashley River extension, 1,434; cutting below grade in muck-hole, 1,624; excess material on north yard, being a total of 71,176.  Adding to the 71,644 yards as above, 3,298˙yards, which is one-half the difference between Nichols' and Twiggs' calculations of ˙the borrow pit, makes 74,942 yards, which at 22 cents would amount to $16,487.24 instead of $19,432.72, making a difference in this item alone of $2,944.48.  Leaving all other items of the master as correct, this would leave a balance in favor of Williams & Co. of $2,394.07.

10. It was, we submit, error to hold that the letter of February 15, 1911, from Twiggs & Son to Williams & Co., admitting the correctness of the statement of account then rendered by Williams & Co., did not constitute an account stated and a bar to plaintiffs now attempting to recover other matters covered by the period of said account.  It was, we submit, a solemn admission, which cannot now be disputed.

11. The facts of this case show that plaintiffs, as subcontractors, being unable to perform their work or pay for their labor, applied to defendants for assistance, and defendants, at their request, lent them money for carrying on the work, taking as security a mortgage of a steam shovel.  On the 1st of January, 1911, Twiggs & Son, having broken their contract and being unable to complete the work, turned it over to Williams & Co. for completion.  Williams & Co. com-

pleted the work and demanded a payment of their debt
secured by said mortgage, which now amounts to $3,363.65
with interest thereon at 8 per cent.    Payment having been
refused, proceedings to foreclose were commenced.    Instead
of collecting their just debt of $3,365.65, this debt has been
cancelled and an additional debt of $3,329 imposed, a total
loss of $6,692.65.    This is said to be the decree of a Court
of equity.    Plaintiffs in this injunction suit with the burden
of proof resting upon them rested their case upon their state-
ments alone.    Defendants established their case by their
own testimony and corroborated it by numbers of disinter-
ested witnesses.    We, therefore, submit that the Court below
erred in its findings of fact against defendants and con-
tend that the clear weight of the testimony sustains our posi-
tion, and submit that on the law and the facts the judgment
below must be reversed, the injunction be dissolved, and a
judgment in favor of defendants for the amount of their
mortgage debt, $3,363.65 and interest, be rendered.


*Messrs. W. Huger Fitzsimons* and *Thomas W. Davis,*
for appellant, submit: *No parol testimony of previous con-
versations was admissible to show the terms of the contract:*
77 S. C. 191; 62 S. C. 414.    *Acceptance of terms offered in
letter constituted the contract:* 93 Fed. 367; 42 U. C. Q. B.
115; 36 *Ib.* 46; 144 N. Y. 209; 3 Tex. App. Civ. Cases, 267;
L. R. 5 Q. B. 346; Clark Contracts 38; 2 Parsons Con-
tracts 285, 286.    *So much of the contract between Williams
and the railroad as is applicable to the Bennett Yard work is
a part and parcel of the contract between Williams and
Twiggs, although not signed:* Clark Contracts 38; 2 Whar-
ton Contracts, sec. 645; 2 Parsons Contracts, pp. 285, 286;
9 Cyc. 282; 3 App. Cases, 1124; 23 L. R. A. 707; 29 Ga.
158; 8 Ch. Div. 70; 144 N. Y. 209; 9 Ves. 351; 11 N. Y.
441; 6 H. of L. 238; 64 N. C. 743; 21 N. Y. 305.    *All
agreements and conversations prior to the letters of Wil-
liams of May 17th were merged into the written contract as*

*contained in the letters of May 17th and 20th:* 17 Cyc. 567; 46 S. C. 372; 24 S. E. 294; 34 S. C. 330; 13 S. E. 525; 19 S. C. 121; 77 S. C. 191; 57 S. E. 766; 82 S. C. 441; 72 S. E. 74; 125 Fed. 110; 24 S. E. 646; 23 S. E. 611; 23 S. E. 772; 17 S. E. 882; 16 S. E. 220; 45 S. E. 711; 96 U. S. 544. *Custom as to measurements in estimating work done:* 24 Vt. 660. *Subcontractor bound by terms of contract with railroad company:* 33 Cyc. 341; 16 Pa. St. 469; 55 Am. Dec. 519. *Certificates of railroad engineer final and binding on both parties in absence of fraud or gross mistake:* Wait on Engineering and Architectual Jurisprudence, sec. 445; 33 Cyc. 333, *et seq.;* 116 N. Y. 19; 15 Am. St. Rep. 376; 34 Am. St. Rep. 403; 51 Ga. 348; 138 U. S. 185; 58 N. E. 335; 38 Fed. 304; 112 N. Y. 30; 27 Vt. 673, 679; 55 Am. Dec. 519; 20 N. Y. 463; 11 Gratt. 676; 50 N. Y. 228; 69 Tex. 691; 95 Tenn. 543; 114 U. S. 549; 109 U. S. 618; 138 U. S. 165; 97 U. S. 402; 10 Ill. 521. *In order to prove fraud or mistake on the part of the engineer it must be alleged:* 9 Enc. Pl. & Pr. 684; Wait, sec. 427; Kerr on Fraud and Mistake, pp. 365, 366, 407. *Account stated between parties:* 57 Miss. 51; 4 N. W. 411; 6 Me. 307; 23 Pa. 961. *Could only be impeached for mistake:* 49 N. Y. Supp. 154; 60 N. Y. Supp. 668; 15 Pac. 371; 2 Greenleaf Ev., sec. 126; 1 Cyc. 364; 54 Am. St. Rep. 93; 12 Pet. 300.

*Messrs. Nathans & Sinkler,* for respondent, cite: *As to admission of parol testimony to supplement written contract:* 93 S. C. 529. *Finding of fact:* 79 S. E. 90; 91 S. E. 476; 92 S. C. 601.

August 26, 1914.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

The printed "Case" contains between six and seven hundred pages. It was admitted, at the hearing, that not more than one-third of the matter contained therein is per-

tinent to the questions presented for decision. Examination shows that, if it had been prepared according to the rules, it could probably have been reduced to from one to two hundred pages. The Court would, therefore, be warranted in dismissing the appeal, without consideration of the merits, because of the violation of its rules. In numerous cases, the bar have recently been admonished about this matter. If these admonitions continue to go unheeded, the Court will be compelled to protect itself by dismissing the appeal, when the "Case" is not prepared according to its rules.

In preparing the "Case," instruments of writing, such as the pleadings, wills, deeds, notes, bonds, mortgages, bills of lading, policies of insurance and the like should not be set out in full, unless the instrument is to be construed; and, even then, only so much of it as is necessary to a proper construction should appear. Ordinarily, it is sufficient to state the substance of such instruments; but, if special consideration of any part is desired, such part should be set out in full, and the substance of the remainder stated. If it should happen, as it sometimes does, that the different parts of an instrument are so dependent upon other, or otherwise so correlated that the whole is necessary to a proper understanding or construction of any part, then the whole instrument should appear. But we often find in the "Case" the whole of a bill of lading or policy of insurance, when only one clause or stipulation is to be considered or construed. Deeds and mortgages are often set out at length, including the probate thereof and renunciation of dower, when the part necessary for consideration could be stated or set out in half a dozen lines. This is not only an unnecessary tax upon the time and patience of the Court, but it is a useless waste of the money of litigants.

Whenever it is necessary to present the testimony to this Court, it should be stated in narrative form, and only the substance of it given, without repetition, omitting all that is

irrelevant to the issues to be decided.    When the questions
and answers are necessary to elucidate the point to be
decided, or it is desired to call attention to the exact lan-
guage of a witness, the same may properly be inserted.

It may be suggested that it is often difficult for counsel
to agree as to what is a correct synopsis of the evidence.    In
such cases, let the Circuit Judge decide between them.    If
he rules erroneously, his ruling is subject to appeal, to be
heard in connection with the principal appeal; and this
Court will decide the matter, and impose the payment of
costs and disbursements accordingly, for counsel have the
right, and it is their duty, to protect their clients against the
possibility of having to pay for unnecessary printing as
disbursements.

The bar is again warned that the rules of this Court must
be complied with in the preparation of the "Cases" for
appeal, and that, in future, the Court will feel at liberty to
decline to consider any appeal in which the "Case" is not
prepared according to the rules.

The facts are clearly stated in the master's report.    As
will be seen by reference to that report, the master held that
the contract between the parties was in writing, and that it
consisted of the letters of May 17th and 20th, and so much
of the contract between Williams & Co. and the railroad
company as was applicable to the work undertaken by
Twiggs & Son, except as to prices and scope of work to be
done by them.

The Circuit Court overruled this conclusion, and held,
under the authority of *Herlong* v. *Southern States Lumber
Co.*, 93 S. C. 529, 77 S. E. 219, that the contract
was partly written and partly verbal, the verbal part
consisting of the conversation referred in Williams
& Co.'s letter of the 17th to Twiggs & Sons.

His Honor misconstrued the opinion of the Court in the
Herlong case.    In that case, the language of the letter which
was construed to make a previous conversation a part of the

contract was as follows: "The administration of the company's affairs to be along the lines which I talked of with you, when at Dunbarton, on Saturday." The Court said: "The talk at Dunbarton was adopted as a part of the contract, and, of course, could be proved only by parol." But, in this case, the letter of May 17th does not refer to the previous conversation as a part of the contract, but the reference to them was for the purpose of confirming and making only so much of them as was included in the letter a part of the contract. The part not included therein was not confirmed, and was, therefore, not a part of the contract. Plaintiffs' letter of the 20th, in reply shows clearly that they so understood the defendants' letter of the 17th, for they said, "yours of the 17th, *covering agreements made*," etc. If defendants' letter of the 17th had not *covered* all the agreements made, surely plaintiffs would not have said that they did.

Twiggs & Son agreed that they would sign the same kind of contract with Williams & Co. as the latter had with the railroad company. In the absence of fraud, accident or mistake, they should not now be heard to say that they are not bound by that agreement, because they did not know or understand the terms of the contract between Williams & Co. and the railroad company. It was their duty to ascertain what its terms were before agreeing to sign it. Of course, if Williams & Co. misrepresented its terms, Twiggs & Son would be bound by it only in so far as its terms were what they were represented to be. But there is no evidence of any such misrepresentation, except in reference to the matter of unloading track material, which was waived by Twiggs & Son, and is of no consequence as to the issues now before the Court.

Reason and authority abundantly support the proposition that one contract may be made a part of another by reference to it. In *Dunbar* v. *Ry.,* 62 S. C. 414; 40 S. E. 884, it was held that "where a shipper accepts for freight delivered

to a common carrier a receipt containing the provision that this shipment is received subject to the terms and conditions of the carrier's regular bill of lading, for which this receipt may be exchanged, he has such notice as will put him on inquiry of the terms and conditions of the bill of lading, and is bound by such terms and conditions." The master's conclusion was correct.

The next question is: Did the master and Circuit Judge err in holding that, as there were no words in the contract limiting Twiggs & Son to payment for excavation within the limits of the roadbed, they should be paid for excavation outside those limits? On this point, the testimony of the expert witnesses as to the meaning of the words of the contract is conflicting, and, while we have been impressed by the able and zealous argument of appellants' counsel, we cannot say that the preponderance of the evidence is against this concurrent finding of the master and Circuit Judge,—especially in view of the following provision in the contract submitted by Williams & Co. to Twiggs & Son for execution: "Grading will include all excavations and embankments, and will be paid for 'one way' only, either for excavation or embankment, according to the largest quantity." The words of the proposed contract are "all excavations," etc. While the words "roadbed measurement" were not appropriate to the contract between plaintiffs and defendants, there is no reason why other words which would have limited payment to quantities within the slope stakes could not have been used.

It follows from what has already been said as to what the contract was, that the Circuit Court erred in overruling the conclusions of the master that plaintiffs were not entitled to pay for surfacing material. The contract of defendants with the railroad company, by the terms of which plaintiffs were bound, expressly provides "that the price for track-laying and surfacing is to include the providing, delivery,

and putting in place all such surfacing material as is required by the specifications."

The other points raised by the exceptions are overruled for the reasons stated by the master, which were concurred in by the Circuit Court.

The judgment of the Circuit Court is modified according to the view herein announced.